ENRON CORPORATION, Appellee,

v.

LAWYERS TITLE INSURANCE CORPORATION, Appellant.

ENRON CORPORATION, Appellant,

v.

LAWYERS TITLE INSURANCE CORPORATION, Appellee.

Nos. 90–2964NE, 90–2965NE.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1991.

Decided July 25, 1991.

Rehearing Denied Aug. 19, 1991.

Robert Becker, argued (Donald J. Buresh, on brief), Omaha, Neb., for appellant.

Jerrold L. Strasheim, argued (Mary Leiter Swick, on brief), Omaha, Neb., for appellee.

Before FAGG and MAGILL, Circuit Judges, and HENLEY, Senior Circuit Judge.

MAGILL, Circuit Judge.

Lawyers Title Insurance Corporation appeals from the district court's judgment holding that it breached a duty to defend Nebraska-based Enron Corporation under a title insurance policy against claims raised in opposition to Enron's foreclosure action in the Virgin Islands. On cross-appeal, Enron argues that the district court erred in ruling: that Enron was not entitled to certain settlement costs; that Enron was not entitled to prejudgment interest; that Enron could not recover punitive damages; and that Lawyers Title was not liable for the tort of bad faith. We reverse and remand for a determination of whether the factual allegations of the claims in opposition to Enron's foreclosure action state a claim that the insurance policy at issue potentially covered.

## I.

The issues presented in this appeal originated in the oil crisis of the early 1970s. In 1973, Enron Corporation (Enron) had a subsidiary, UPG, Incorporated, which marketed liquefied petroleum gas and other petroleum products. To ensure that UPG had access to crude oil during the oil crisis, Enron established a relationship with the Virgin Islands Refinery Corporation (VIRCO), ultimately buying twenty shares of VIRCO stock for $250,000. In early 1974, VIRCO sought to borrow $400,000 from Enron to obtain an extension of an option to purchase certain property. VIRCO wished to build an oil refinery on this property, which consisted of 350 acres in St. Croix, U.S. Virgin Islands. Although Enron was willing to loan VIRCO the necessary funds, VIRCO was unable to obtain the extension and the initial purchase plan fell through.

VIRCO still wanted the property, however, and sought Enron's further assistance in buying it. To help VIRCO acquire the property, Enron essentially lent the refinery $8.2 million of the approximately $10 million purchase price. Closing of title on the sale occurred in February of 1974. At that time VIRCO gave Enron a promissory note for $8.2 million, which was secured by a mortgage on the property. The mortgage was recorded on June 27, 1974. As part of the purchase agreement, the property's owners, the DeChabert family, deferred receipt of $1 million of the sale price and chose to have that amount secured by a lien on the property. VIRCO executed the lien, designating it a "junior mortgage." The lien was recorded on June 28, 1974.

That same month, Lawyers Title Insurance Corporation (LTIC) issued a title insurance policy covering Enron's interest as mortgagee of the St. Croix property. The policy provided, in pertinent part:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE ... LAWYERS TITLE INSURANCE CORPORATION [Company] ... insures ... against loss or damage ... and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

    ....

2. Any defect in or lien or encumbrance on such title;

    ....

6. The priority of any lien or encumbrance over the lien of the insured mortgage;

    ....

CONDITIONS AND STIPULATIONS

    ....

3. Defense and Prosecution of Actions—Notice of Claim to be given by an Insured Claimant

(a) The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or defenses, restraining orders or injunctions interposed against a foreclosure of the insured mortgage ... to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy.

App. at 248, 251.

VIRCO was never able to build the refinery, and in 1978 it defaulted on the Enron loan. On August 30, 1978, Enron filed a foreclosure action in federal district court in the Virgin Islands. App. at 8. Both VIRCO and the DeChaberts contested the foreclosure action. The DeChaberts, in a responsive pleading filed November 29, contested on the grounds that they had actually received a mortgage before Enron did and thus were the first priority secured creditors, and that the "junior mortgage" was a sham, because Enron and VIRCO were basically one and the same.[1] *Id.* at 254–55. In its responsive pleading, VIRCO basically agreed with the DeChaberts' contention as to the relationship between it and Enron, arguing that since 1973 Enron had been a major shareholder and inside control party of VIRCO. *Id.* at 265. As regards the $8.2 million "loan" from Enron in 1974, VIRCO contended:

[VIRCO] received no consideration whatsoever for its execution of the above-described promissory note and purported mortgage. The [$8.2 million] which [Enron] alleges it advanced to [VIRCO] in consideration of said note and purported mortgage was, in reality, payment to [VIRCO] for its transfer to [Enron] of 500 shares of [VIRCO] common stock, the option to acquire an additional 3,000 shares of [VIRCO] stock, and other rights relating to the use of the [VIRCO] refinery and the purchase of petroleum and petroleum products from said refinery.

*Id.* at 268.

Enron and LTIC each retained separate law firms to work on the foreclosure. Neither the clients nor the law firms entered into any agreement concerning the scope of each other's representation of Enron. Both sets of attorneys represented Enron in the foreclosure until the parties settled in February 1982.[2] The settlement was memorialized in a consent decree that was entered on March 5, 1982. The following May, Enron submitted a claim to LTIC for the expenses of its separate counsel during the foreclosure proceedings. LTIC took the position that Enron was seeking reimbursement for expenses incurred in connection with the sham claim—expenses, LTIC contended, for which it was not liable because the claim was not covered by the policy. Because LTIC believed it had satis-

---

1. The parties refer to the first argument as the "priority claim" and to the second argument as the "sham claim." We shall do likewise.

2. The record indicates that Enron's counsel performed much of the work associated with the foreclosure action.

fied its duty to defend the priority claim, which was covered by the policy, and because it had never agreed to pay for Enron's providing a separate defense, LTIC rejected Enron's claim.

On June 12, 1986, Enron filed suit against LTIC in federal district court in Nebraska. Enron first alleged that LTIC had breached its duty to defend Enron. Enron also alleged that certain actions of LTIC and its Virgin Islands counsel constituted a breach of the duty of good faith, and that LTIC had been unjustly enriched by refusing to defend Enron. Enron sought $1.4 million in damages resulting from the delay in acquiring the St. Croix property, approximately $359,000 in attorney fees, costs, and expenses, $68,000 in costs associated with the foreclosure settlement, and punitive damages.[3]

As regards Enron's duty to defend claim, LTIC again argued that because the priority claim was covered by the policy, LTIC was only obligated to defend that claim, and had properly done so. LTIC reasserted its belief that it had no duty to defend the sham claim.

After a bench trial, the district court, applying Virgin Islands law, concluded that LTIC had breached its duty to defend Enron in the foreclosure action. *See Enron Corp. v. Lawyers Title Ins. Corp.*, No. CV 86–O–477, slip op. at 15 (D.Neb. Jan. 4, 1990). In rejecting LTIC's argument, the district court observed that "Enron has never disputed that the sham claim was not covered by the policy," *id.* at 17, but opined that "[w]hether the sham claim involved a matter covered by the policy is essentially irrelevant." *Id.* at 9–10. Later in the opinion, the district court reiterated its position: "As stated above, the duty to defend extends to all claims no matter whether they are within or without the policy coverage." *Id.* at 15. The district court rejected Enron's other two causes of action and its claim for prejudgment interest. The district court thus held LTIC liable for approx-

imately $332,000 in defense costs, as well as $15,000 in settlement costs. Both parties now appeal.

## II.

### A. Applicable Law

The district court held, and the parties agree, that Virgin Islands law controls the analysis of all but one of the issues in this case. Where there is no governing statute, Virgin Islands law "directs us to examine the common law, first as expressed in the Restatements, and then as generally understood and applied in the United States. Where the Restatement is silent and a split of authority exists, courts should select the sounder rule." *See Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir.1986).[4] We review de novo the Nebraska district court's rulings on issues of Virgin Islands law. *Cf. Beard v. J.I. Case Co.*, 823 F.2d 1095, 1098 (7th Cir.1987); *Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1339 (9th Cir.1982).

### B. LTIC's Duty to Defend

■ LTIC argues on appeal that the district court erred in holding that it breached a duty to defend Enron. Under the policy in this case, LTIC is obligated to defend any claims that the policy covered. *See supra* Part I; *cf. Buntin v. Continental Ins. Co.*, 525 F.Supp. 1077, 1080 (D.V.I. 1981) ("The insurer's duty to defend is contractual: most insurance policies expressly obligate the insurer to assume the defense of lawsuits arising under the policy."). However, the "duty to defend is broader than the duty to pay." *Cay Divers, Inc. v. Raven*, 812 F.2d 866, 869 (3d Cir.1987). Thus, LTIC also must defend a claim the policy does not cover "if the allegations of the complaint 'state on their face a claim against the insured to which the policy *potentially* applies.'" *See C.H. Heist Caribe Corp. v. American Home Assur-*

---

**3.** Before trial, the district court struck Enron's claim for punitive damages in light of Nebraska's constitutional prohibition against such damages. *See* Memorandum & Order, No. CV 86–O–477 (D.Neb. July 19, 1988).

**4.** Decisions of district courts that sit in the Virgin Islands are appealed to the Third Circuit.

*ance Co.,* 640 F.2d 479, 483 (3d Cir.1981) (quotation omitted; emphasis in original). "In making this determination, the factual allegations of [the] complaint ... are controlling." *Id.*

It is clear, therefore, that if the factual allegations underlying the sham claim did not state a claim to which the policy potentially applied, LTIC had no duty to defend.[5] The district court's opinion contains no examination of the DeChaberts' factual allegations. The district court, without analysis, did observe in a footnote that the sham claim and the priority claim "were closely related," slip op. at 13 n. 9; this observation, however, does not satisfy the requirement of *C.H. Heist Caribe Corp.*

We note that courts have taken a strong stand against holding insurers liable for the defense costs of claims their policies do not cover, even when those claims are joined with covered claims. For example, the Fifth Circuit has joined the Sixth Circuit in holding that an insurer should be held liable for the defense of covered and noncovered claims only where " 'there is no reasonable means of prorating the costs of defense between the covered and not-covered items.' " *EEOC v. Southern Publishing Co.,* 894 F.2d 785, 791 (5th Cir.1990) (quoting *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212, 1224 (6th Cir.1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981)). *See also Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 282 (9th Cir.1986) ("If an action ... incorporates both covered and uncovered claims, the parties must apportion the costs so that [the insurer] need

only pay for amounts generated in defense of covered claims."); *Harborside Refrigerated Svcs., Inc. v. IARW Ins. Co.,* 759 F.2d 829, 831 (11th Cir.1985) (stating that defense costs should be apportioned between covered and noncovered claims where practicable).[6]

Because the district court failed to examine the factual allegations underlying the sham claim before concluding that LTIC was liable to Enron for the defense costs associated with that claim, we reverse the district court's judgment. On remand, the district court should determine whether the sham claim's factual allegations state on their face a claim that LTIC's policy potentially covers.

### C. Enron's Cross–Appeal

Enron raises four issues in its cross-appeal. If on remand the district court determines that LTIC had no duty to defend the sham claim, all of these issues will be moot. Therefore, we address the issues to guide the district court in case it determines that LTIC did breach its duty to defend.

### 1. Settlement Costs

■ Enron first argues that the district court erred in refusing to hold LTIC liable for all of the costs Enron incurred in settling with VIRCO and the DeChaberts. Under Virgin Islands law, an insurer who breaches its duty to defend is liable for the insured's reasonable settlement costs. *See Hess Oil V.I. Corp. v. Firemen's Fund Ins. Co.,* 626 F.Supp. 882, 886 (D.V.I.1986). The district court found that even though LTIC did breach its duty to defend, the

---

5. Even the cases the district court cited in support of its statement that an insurer must defend an action featuring claims both within and without policy coverage direct that the duty to defend is generally determined by the allegations in the pleadings. *See United States Fidelity & Guar. Co. v. Louis A. Roser Co.,* 585 F.2d 932, 936 (8th Cir.1978) (interpreting Minnesota law); *Babcock & Wilcox Co. v. Parsons Corp.,* 430 F.2d 531, 533–36 (8th Cir.1970) (interpreting Nebraska law).

6. Although we discuss apportionment only to emphasize courts' unwillingness to burden insurers with the cost of defending noncovered claims, one of Enron's arguments on this issue

deserves a response. Enron argues that apportionment of costs between covered and noncovered claims is impermissible under Virgin Islands law. Enron's Brief at 31. Enron cites *Buntin,* 525 F.Supp. at 1080, in support of this assertion, apparently relying on the following language: "The liability of the insurer for the simple breach of the duty to defend is ordinarily limited to the amount of the policy involved plus the insured's expenses in defending the action." *Id.* This statement obviously does not support Enron's argument as to apportionment, and instead merely restates the general rule as to an insured's liability for breaching a duty to defend.

May 1982 consent decree contained an express agreement that LTIC was to pay only $15,000 of the settlement costs, and that Enron was responsible for the rest. Enron contends that this finding is clearly erroneous.

We agree with Enron. The decree itself provided, in pertinent part:

Each party shall pay its own costs, including attorney's fees, except that upon receipt of releases from all the DeChaberts, [Enron] will promptly forward to the DeChaberts or their designee, the sum of $53,333.00 consisting of $38,333.00 from [Enron] and $15,000.00 on behalf of [LTIC].

App. at 970. *Hess* mandates that a breaching insurer is liable for the *insured's* reasonable settlement costs. The plain language of the consent decree indicates that LTIC's $15,000 was used to reimburse the DeChaberts' settlement costs, not Enron's settlement costs. Therefore, the $15,000 does not satisfy LTIC's liability for Enron's reasonable settlement costs.[7]

### 2. Prejudgment Interest

■ Enron next argues that the district court erred in failing to award prejudgment interest. Under Virgin Islands law, "the district court is given discretion to award prejudgment interest on unliquidated sums as justice requires." *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 329 (3d Cir.1985). The district court, in denying prejudgment interest, remarked: "The Court is still of the opinion that *both* Enron and [LTIC] should have taken some initiative early on in the Virgin Islands' litigation to determine each party's responsibility for the defense. Therefore, it is sufficient to say that, in this case, justice does not require the awarding of prejudgment interest." Slip op. at 19 (emphasis in original).

As a matter of good business practice, we agree with the district court, and strongly disagree with Enron's contention that this statement "place[s] the risk of

determining an insurer's duty to defend squarely on the shoulders of the insured." Enron's Reply Brief at 4. This contention is overstated, for the district court's observation merely addresses why it believed justice did not require an award of prejudgment interest, and in no way shifts the risk of liability for not defending a claim from the insurer to the insured. Enron's other arguments on this issue are equally without merit. Thus, on remand, the district court would not abuse its discretion in denying prejudgment interest.

### 3. Punitive Damages

■ Enron also contends that the district court erred in striking its claim for punitive damages. Enron argues that because the Virgin Islands had the most significant relationship to the foreclosure action, its law, which allows punitive damages, controls, as opposed to Nebraska law, which prohibits punitive damages.

In diversity cases, federal district courts must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). As Nebraska's choice of law rules apply, we review the district court's ruling on this issue de novo. *Salve Regina College v. Russell*, — U.S. —, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). In contract and tort cases, Nebraska courts have adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws (1971) (hereinafter Restatement). *See Myers v. Columbus Sales Pavilion, Inc.*, 575 F.Supp. 805, 807 (D.Neb.), *aff'd per curiam*, 723 F.2d 37 (8th Cir.1983). The Restatement provides: "The law selected by application of the rule of § 145 determines the right to [punitive] damages." Restatement § 171, Comment d. Section 145 provides: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship

---

7. On remand, the district court remains free to examine the reasonableness of Enron's settlement costs.

to the occurrence and the parties under the principles stated in § 6." Restatement § 145(1).[8] Section 6, in turn, lists a number of factors that are relevant to choosing the applicable law. These include "the relevant policies of the forum" and "the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue." *Id.* § 6(b), (c).

Enron argues that the application of these principles requires that Virgin Islands law controls the issues of punitive damages.[9] Certainly some of the contacts enumerated in § 145(2) support the application of Virgin Islands law. Some also support the application of Nebraska law. Ultimately, we agree with the district court that the relevant policies of Nebraska and the Virgin Islands are the proper focal points of this inquiry. The Nebraska policy is clear: "[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction." *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566, 574 (1989).[10] Enron adduces no such specific expression of support for the Virgin Islands' policy of permitting punitive damages. Indeed, we note that the Virgin Islands permits punitive damages only because such damages are provided for in § 908 of the Restatement (Second) of Torts (1977). *See Berroyer v. Hertz*, 672 F.2d 334, 340 (3d Cir.1982). Although the Virgin Islands certainly has an interest in punitive damages in this case, we do not believe it is a very strong one. Therefore, balancing Nebraska's clear constitutional prohibition against the Virgin Islands' adoption of the Restatement's position, we conclude that Nebraska has the most significant relationship to this case with respect to the issue of punitive damages, and that the district court thus properly struck Enron's claim for such damages.[11]

### 4. Bad Faith

Enron argues that the district court erred in not holding LTIC liable for the tort of bad faith. Under Virgin Islands law, liability for the tort of bad faith requires:

1) the existence of an insurance contract between the parties and a breach by the insurer; 2) intentional refusal to pay the claim; 3) the non-existence of any reasonably legitimate or arguable reason for the refusal (debatable reason) either in law or fact; 4) the insurer's knowledge of the absence of such a debatable reason or 5) when the plaintiff argues that the intentional failure results from the failure of the insurer to determine the existence of an arguable basis, the plaintiff must prove the insurer's intentional failure to determine the existence of such a debatable reason.

*Justin v. Guardian Ins. Co.*, 670 F.Supp. 614, 617 (D.V.I.1987).

---

**8.** Section 145 also lists the types of contacts that may be taken into account in determining which state's law applies: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement § 145(2). The Restatement cautions, however, that these contacts are not dispositive, and must be "evaluated according to their relative importance with respect to the particular issue." *Id.*

**9.** We note that the appropriate analysis is which jurisdiction has the most significant relationship to the occurrence with respect to the particular issue, and not which had the most significant relationship to the occurrence in general, as Enron seems to urge. *See* Enron's Reply Brief at 19. That Virgin Islands law controls some issues in this case, while Nebraska law controls another, is perfectly consistent with the Restatement's choice of law principles.

**10.** This policy does not mean, however, that punitive damages will never be proper in Nebraska district courts sitting in diversity cases. Each case must be determined on its own merits depending on the choice of law principles at issue.

**11.** We note that our ultimate conclusion as to this issue is also supported by our holding in the next section that LTIC as a matter of law is not liable for the tort of bad faith. We also note that as regards punitive damages, Enron has no one to blame but itself, for it chose the Nebraska forum, and employed Nebraska lawyers, who should have been aware of Nebraska's rule as to punitive damages and its potential applicability to this case.

Enron on appeal alleges numerous acts that it contends show LTIC's bad faith, and argues that "LTIC's conduct ... is outrageous because of LTIC's evil motive to deprive Enron of its rights under the policy." Enron's Reply Brief at 15. What Enron fails to do, however, is show the nonexistence of any reasonably legitimate or arguable reason for LTIC's refusal to pay the defense costs associated with the sham claim. The district court found that LTIC's refusal was an honest one, slip op. at 17, based on LTIC's belief that its policy did not cover the sham claim. Although on remand the district court may determine that LTIC's belief was incorrect, LTIC still had a reasonably legitimate or arguable reason for refusing to pay the defense costs.

Therefore, we believe it is appropriate to forestall any further consideration of this issue. We hold that as a matter of law, LTIC was entitled to judgment in its favor on Enron's bad faith claim, because LTIC had a reasonably legitimate reason to refuse to defend the sham claim, namely, its belief that the sham claim was not covered by the policy.

### III.

Accordingly, the district court's judgment is reversed. On remand, the district court shall conduct proceedings consistent with this opinion.