The **MORROW CORPORATION,**
**et al., Plaintiffs,**

v.

**HARLEYSVILLE MUTUAL**
**INSURANCE CO., et**
**al., Defendants.**

**No. Civ.A. 99–1782–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

June 22, 2000.

Michael O. Hill, Joseph James Green, Collier, Shannon, Rill & Scott, Washington, D.C., for plaintiffs.

Edward Harrison Grove, III, Brault, Palmer, Grove, Zimmerman, White & Mims, Fairfax, VA, Richard W. Driscoll, Eccleston and Wold, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This coverage dispute between two insurers and their insureds raises questions on summary judgment concerning (i) the insurers' duty to defend a lawsuit on behalf of their insureds and (ii) their duty to indemnify the insureds for the sums paid to settle the lawsuit.

### I.

The essential facts are not in dispute. The record reflects that from May 1986 until May 1992, plaintiffs, Dean and Marilyn Morrow and their corporation, the Morrow Corporation, leased Store No. 8 at the Greenbriar Town Shopping Center in Chantilly, Virginia, at which they operated a "plant-on-premises" dry-cleaning business.[1] In 1992, plaintiffs moved their business to another location in the Greenbriar Town Shopping Center, where they continued to operate until 1996, at which time the Greenbriar Town Shopping Center was sold. During this time, plaintiffs had several different insurance policies for their business. Harleysville Mutual Insurance Co. ("Harleysville") insured plaintiffs during their first year of business from May 1986 through May 1987. In May 1987, plaintiffs obtained insurance from Sentry Insurance Co. ("Sentry"). Plaintiffs continued to purchase their insurance from Sentry the remaining time they were in business, although the details of their policies changed several times over the years. All of the policies—the single Harleysville policy and the various Sentry policies—were comprehensive general liability policies with property, liability and crime coverage.

Although similar in this respect, the various policies differed in the terms used to define coverage for damage resulting from pollution. Thus, the single Harleysville policy in effect from May 1986 to May 1987 contained a coverage exclusion for "bodily injury or property damage arising out of the actual or threatened discharge, dispersal, release or escape of pollutants." The two Sentry policies in effect from May 1987 through May 1989 contained an essentially similar exclusion for "bodily injury or property damage arising out of the discharge, dispersal, release, or escape of ... contaminants or pollutants into or upon land, the atmosphere or any water course or body of water." But these policies also included an exception to the pollution exclusion for any "sudden and accidental" discharges or releases of pollutants, which category of discharges were therefore afforded coverage. From May 1989 through 1990 the

---

1. This description of plaintiffs' business means that the dry cleaning operations were accomplished on the premises of Store No. 8, and not farmed out to another location.

scope of the pollution coverage reverted to the original 1986–1987 coverage, as the two Sentry policies in effect during this period included an attachment that replaced the previous pollution exclusion clause with an exclusion identical to the one found in the Harleysville policy. Finally, from May 1991 through May 1995, the scope of pollution coverage changed yet again, as the Sentry policies in effect during these years included a provision designed for dry-cleaning businesses, entitled "Pollution Liability Insurance." According to this provision, the policies covered bodily injury or property damage arising from "the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." Excluded from coverage under this provision, however, was "any loss, cost or expense arising from any direction or request that you [the insured] test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants."

In sum, the various insurance policies fall into three essential categories: (i) those containing an "absolute pollution exclusion,"[2] namely the single Harleysville policy, and the 1989 and 1990 Sentry policies, (ii) those containing a pollution exclusion with an exception for "sudden and accidental" discharges of pollutants, namely the 1987 and 1988 Sentry policies, and (iii) those containing the pollution liability insurance, namely the 1991 through 1995 Sentry policies.

In conducting their dry-cleaning business, plaintiffs used a solvent containing a chemical known as perchloroethylene ("PCE"), a toxic and hazardous substance. When released into the environment, PCE degrades or breaks down, forming vinyl chloride, another hazardous or toxic chemical. The presence of PCE and its breakdown products is regulated by the United States Environmental Protection Agency ("EPA") and the Virginia Department of Environmental Quality.

In 1996, as part of the sale of the Greenbriar Town Shopping Center, which was owned by the Greenbriar Limited Partnership ("Greenbriar"), a site examination was conducted to determine whether the shopping center, or the soil or groundwater beneath it, was contaminated as a result of any tenant's operations. The examination revealed PCE contamination in the soil and groundwater under the first location of plaintiffs' business, Store No. 8. Pursuant to the shopping center purchase agreement, Greenbriar was required to bear all costs for the inspection and remediation of the PCE contamination at the site.

In November 1998, Greenbriar filed suit against plaintiffs seeking damages and injunctive relief requiring plaintiffs to remedy, or bear the costs of remedying, the PCE contamination. The complaint alleged that through negligence or otherwise, from May 1986 to May 1992, plaintiffs had, knowingly or otherwise, allowed their employees, agents, or others acting on their behalf to spill or otherwise release PCE into the environment, which contaminated the soil and groundwater under and surrounding the leased property.[3] In addition, the complaint alleged violations of CERCLA, 42 U.S.C. § 9601 *et seq.*, under which plaintiffs were said to be strictly liable for any harm resulting from environmental releases at their business, provided that there had been at least one documented release at their store. Plaintiffs, who claimed that any contamination resulted from the previous owners' dry-cleaning business, not theirs, sought from defendants a defense and indemnification, pursuant to the various insurance policies. Sentry first requested more information

---

**2.** The phrase "absolute pollution exclusion" refers to the policy pollution exclusion that *does not* contain an exception for "sudden and accidental discharges."

**3.** The Greenbriar suit and complaint are referred to in this insurance coverage context as the "underlying" suit and the "underlying" complaint, as that suit is the basis for this one.

from plaintiffs relating to the facts of Greenbriar's claims, but ultimately both Sentry and Harleysville refused to indemnify, or even defend plaintiffs against the claims, based on the various pollution exclusions in the insurance policies. Because they lacked the resources to defend the Greenbriar suit, plaintiffs ultimately settled the case in August 1999. In the course of defending themselves, plaintiffs incurred attorneys' fees and other costs, as well as the cost of the settlement.

Plaintiffs brought the instant action against defendants in November 1999, stating claims for declaratory relief and breach of contract based on defendants' failure to defend and indemnify them in connection with the Greenbriar suit. Plaintiffs have moved for partial summary judgment only as to defendants' duty to defend them against the Greenbriar lawsuit. Sentry and Harleysville have filed cross-motions for summary judgment on both the duty to defend and the duty to indemnify. These motions, having been fully briefed and argued, are now ripe for disposition.

## II.

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Rule 56, Fed.R.Civ.P.; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). These principles govern whether the current factual record is suitable for summary judgment.

## III.

The issue presented by plaintiffs' motion is limited to whether defendants, by virtue of their insurance contracts with plaintiffs, had a duty to defend plaintiffs against the Greenbriar lawsuit. Defendants' motion is broader; it seeks a determination as to both the duty to defend and the duty to indemnify. These two duties of insurers are separate responsibilities and the scope of coverage is different for each. *See Town Crier, Inc. v. Hume*, 721 F.Supp. 99, 101 (E.D.Va.1989). Thus, courts interpreting insurance policies have consistently construed the duty to defend as being broader than the duty to indemnify. *See id.; VEPCO v. Northbrook Property & Cas. Ins. Co.*, 252 Va. 265, 475 S.E.2d 264, 265 (1996). Under Virginia law,[4] the duty to defend "arises whenever the complaint [against the insured] alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *VEPCO*, 475 S.E.2d at 265. Conversely, an insurer is not obligated to defend its insured when "under the allegations of the complaint, it would not be liable under its contract for any recovery therein had." *Id.* at 266. If it is unclear whether the suit against the insured falls within the ambit of the insurance policy, the insurer's refusal to defend is at its own risk, and if it is later shown that the claim against the insured *was* covered by the policy, the insurer "is necessarily liable for breach of its covenant to defend." *Id.* On the other hand, where it appears clear that the insurer would not be liable under the policy for any judgment based on the allegations in the underlying complaint, it has no duty even to defend. *See Town Crier*, 721 F.Supp. at 102. In sum, a duty to

---

4. As the insurance policies were signed and delivered in Virginia, their interpretation is governed by Virginia law. *See Brand Distrib-* *utors v. Insurance Co. of North America*, 400 F.Supp. 1085, 1089 (E.D.Va.1974).

defend may arise even though ultimately no duty to indemnify is found, but if there is no duty to defend *ab initio*, there can be no duty to indemnify.

To determine whether an insurer has a duty to defend an insured in a lawsuit, courts must determine whether any of the claims asserted in the lawsuit fall within the policy's scope of coverage. *See Town Crier,* 721 F.Supp. at 102. This is accomplished by comparing the terms of the policy defining the scope of coverage with the allegations contained in the lawsuit's complaint. *See id.* at 103. There is a duty to defend if any of the complaint's allegations, if proved, fall within the risk covered by the terms of the applicable policy. *See id.* at 103.

■ In the instant case, where several insurance policies are at issue, the first step in the analysis is to ascertain *which* of the various policies plaintiffs purchased during the ten-year period they were in business are implicated by the underlying suit. This question, like the duty to defend question, depends on the policy terms and the allegations of the underlying complaint, specifically the allegations relating to the time·period in which the alleged PCE contamination occurred. According to the pertinent allegations in the underlying complaint, plaintiffs, their employees, agents or others acting on their behalf

spilled or released PCE into the environment "during the operation of [their] Facility." In other words, the Greenbriar complaint alleged that PCE was released throughout the period of time plaintiffs operated their business at Store No. 8, namely 1986 through 1992. And, the underlying complaint further alleged that, although there were no new spills or discharges of PCE after plaintiffs' relocation in 1992, the contamination continued after this time because the contamination was not discovered, and therefore not remediated, until 1996. Thus, based on the underlying complaint, the PCE contamination occurred over a ten year period. On these facts, then, all of the insurance policies in effect for each year during this ten year period are potentially implicated by the underlying suit, and therefore the language of each policy must be examined for its relevance to plaintiffs' claim that defendants' breached their duty to defend that suit. This is so in light of the sensible general rule, which Virginia would likely follow, that "coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage." *Spartan Petroleum v. Federated Mut. Ins. Co.,* 162 F.3d 805, 808 (4th Cir.1998) (applying South Carolina law).[5]

**5.** Neither presented nor addressed here is how liability, if any were found, might be apportioned among the various policies. Strictly· speaking, a policy from any given year should only cover damage that occurred during that year. Yet, because the alleged spills of PCE continued over a six year period, and went unremediated for four more years, it may be difficult, if not impossible, to determine precisely how much damage occurred in any given year. Virginia's courts have not addressed this issue, but the majority of jurisdictions that have done so have concluded that the costs of remediating the contamination should be allocated equally over the years between the commencement of the‚ contamination and its discovery or remediation. *See, e.g., Spartan Petroleum,* 162 F.3d at 812. Thus, if the contamination occurred over five years, and cost $500,000 to remediate, an insurer who provided coverage for one year

would be liable for $100,000 or one-fifth of the total cost. *See id.; see also Public Service Co. of Colorado v. Wallis & Companies,* 986 P.2d 924, 941 (Colo.1999); *Northern States Power Co. v. Fidelity & Cas. Co. of New York,* 523 N.W.2d 657, 664 (Minn.1994). This approach reasonably allocates risk among insurers when more than one policy is in effect during the progressive damage, and also requires the insured to bear the loss for any periods of "self insurance" or no insurance, during the progressive damage. *See Spartan Petroleum* 162 F.3d at 812.

A minority of courts have followed a different approach, holding that where several different policies are triggered and the policies may overlap as to resulting damage,· and where the individual policies obligate the insurers to pay "all sums" for which the insured may be ·legally obligated to pay as damages, each insurer is jointly and severally

As stated above, the policies in effect during the relevant ten-year period fall into three categories. The first category consists of the policies containing the absolute pollution exclusion, namely the 1986 Harleysville policy, and the 1989 and 1990 Sentry policies. The second category of policies, the 1987 and 1988 Sentry policies, are those containing a pollution exclusion with an exception for "sudden and accidental" discharges of pollutants. Finally, the third category of policies are those that contain a provision entitled "Dry Cleaners Additional Coverage." These policies, specifically the 1991 through 1995 Sentry policies, contain a "Pollution Liability Insurance" provision which states that the pollution exclusion does not apply and provides insurance coverage for bodily injury and property damage arising from the release of pollutants. Each category of policies must be separately examined and compared to the allegations in the Greenbriar complaint to determine whether either Sentry or Harleysville had a duty to defend or indemnify plaintiffs in the that suit.

## A. The Absolute Pollution Exclusion

■ This category of policies is the most straightforward. Each policy in this group, specifically the 1986 Harleysville policy and the 1989 and 1990 Sentry policies, contains an identical attachment reciting that "the exclusion relating to the discharge, dispersal, release or escape of ... pollutants is replaced by the following: This insurance does not apply ... to bodily injury or property damage arising out of the actual or threatened discharge, dispersal, release or escape of pollutants." This unambiguous language could hardly be clearer in excluding coverage for any damage resulting from the discharge of pollutants, as alleged in the Greenbriar lawsuit. This lack of ambiguity is significant because, it is well-settled in Virginia that "if the language of an insurance policy is un-

ambiguous, [a court] will give the words their ordinary meaning and enforce the policy as written." *United Servs. Auto. Ass'n v. Webb*, 235 Va. 655, 657, 369 S.E.2d 196, 198 (1988). And, while there is no reported Virginia decision construing this precise policy language, other jurisdictions have held that this exclusion is "clear and unambiguous," and serves to exclude coverage for pollution damage of the sort alleged in the underlying suit. *See, e.g., Guilford Indus. v. Liberty Mut. Ins. Co.*, 688 F.Supp. 792, 794 (D.Me.1988) (applying Maine law). Thus, under this language, Harleysville and Sentry are not liable for any damage resulting from pollution that occurred while the policies containing the absolute pollution exclusion were in effect. As a result, neither Harleysville nor Sentry had a duty to defend plaintiffs against a claim alleging property damage from pollution during the periods covered by these policies. *See Town Crier*, 721 F.Supp. at 102 ("[I]f it appears clearly that the insurer would not be liable under its contract for any judgment based on the allegations, it has no duty even to defend.").

■ Plaintiffs argue, unpersuasively, that while the attachment replaced the pollution exclusion contained in the body of the policy with more specific language, it did not replace the *exception* to the exclusion for sudden and accidental discharges. In other words, plaintiffs claim the attachment only replaced the portion of the pollution exclusion in the body of the policy up to the point where it reads "but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." The text of the attachment persuasively rebuts this argument, as it states that it *replaces* the "pollution exclusion" contained in the body of the policy. And, because the "sudden and accidental" exception is an integral part of the pollution exclusion (it helps define the exclusion's scope), the attachment replaced it,

liable for all costs from the entire period of property damage. *See J.H. France Refracto-* *ries Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502, 507 (1993).

too, along with the rest of the exclusion. Indeed, it appears that the replacement of the "sudden and accidental" exception was the chief purpose of the attachment, as the other differences between the exclusion in the attachment and the original exclusion are hardly sufficient to warrant replacing the original exclusion.[6] Thus, plaintiffs' attempt to limit the attachment's effect is not only counter to its text, but also contrary to its evident purpose. In sum, because the "sudden and accidental" exception was part of the pollution exclusion and because the entire exclusion was replaced by the attachment, there is no merit to plaintiffs' argument that the "sudden and accidental" exception survived the replacement of the pollution exclusion.[7]

It is clear, then, that no duty to defend was triggered by either the 1986 Harleysville policy, or the two Sentry policies containing the absolute pollution exclusion. It follows that there can be no duty to indemnify under any of these policies. Because the only Harleysville policy at issue contained this absolute pollution exclusion, thereby precluding any duty to defend, summary judgment is appropriate for Harleysville on both the duty to defend and the duty to indemnify. And, the same would be true for Sentry were the 1989 and 1990 policies the only two Sentry policies implicated by the underlying complaint. But, as noted, other Sentry policies are implicated by the underlying complaint; and, as shown *infra*, the duty to defend the underlying suit exists under the other Sentry policies. Thus, although Sentry had no duty to defend plaintiff under the 1989 and 1990 policies, because a duty to defend arose under the other Sentry policies, Sentry is not entitled to summary judgment on the duty to defend.

■■■ Even so, the question remains whether Sentry must bear the cost of defending the underlying suit for damage alleged to have occurred during the two-year period the absolute pollution exclusion was in effect. Where, as here, an insurer has a duty to defend an insured under some of the policies implicated by the underlying suit, but not others, courts have struggled with how to apportion the defense costs between the insurer and the insured. The sensible majority rule, which Virginia would likely adopt, is that when "there is no reasonable means of prorating the costs of defense between the covered and the not-covered" periods, the insurer must bear the entire cost of the defense. *See Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1224 (6th Cir.1980) (applying Michigan law).[8] But, where defense costs can be readily apportioned, "the insured must pay its fair share for the defense of the non-covered risk," because the duty to de-

**6.** The attachment identifies the locations and activities covered by the exclusion with greater specificity than the original exclusion.

**7.** Plaintiffs also argue that even if the endorsement replaced the "sudden and accidental" exclusion contained in the body of the policies, defendants are estopped from relying on the exclusion contained in the endorsement because it contained a change in coverage which was not explained to plaintiffs. Defendants argue that the change in coverage was indeed explained to plaintiffs, and, to that end, they submit a supporting affidavit from the Sentry sales representative who sold the Sentry policies to plaintiffs. But, even assuming plaintiffs' claim is true, and they were not aware of the change in coverage, plaintiffs' argument must still fail under Virginia law, which prohibits the doctrines of waiver and estoppel from being used to enlarge the coverage of an insurance policy. *See Blue Cross and Blue Shield of Virginia v. Wingfield*, 239 Va. 599, 601, 391 S.E.2d 73, 74–75 (1990) ("the coverage of an insurance contract may not be extended by estoppel or implied waiver to include risks not covered by its terms") (citing *Sharp v. Richmond Life Ins. Co.*, 212 Va. 229, 233, 183 S.E.2d 132, 135 (1971)).

**8.** Several other federal appellate courts have approved similar pro rata apportionment of defense costs. *See, e.g., Gulf Chem. and Metallurgical Corp. v. Associated Metals and Minerals Corp.*, 1 F.3d 365, 372 (5th Cir.1993) (Texas law); *Enron Corp. v. Lawyers Title Ins. Corp.*, 940 F.2d 307, 311 & n. 6 (8th Cir.1991)(Virgin Islands law); *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 282 (9th Cir. 1986) (Hawaii law).

fend arises solely under contract, and an insurer plainly has not contracted to pay defense costs for occurrences which took place outside the triggered policy periods. *Id.*[9] In the instant case, the factual record is not yet sufficiently developed to permit a determination as to whether the defense costs can be reasonably apportioned between Sentry and plaintiffs. That, like the determination of Sentry's duty to indemnify, must wait until the record is more fully developed. What is clear, however, is that, as Sentry had no duty to defend plaintiffs in the Greenbriar suit under the policies containing the absolute pollution exclusion, it similarly had no duty to indemnify plaintiffs under those policies for pollution damage attributable to that period. Thus, Sentry is not liable for any portion of the underlying suit settlement that may ultimately be allocated to pollution damage that occurred during 1989 and 1990, the period when the Sentry absolute pollution exclusion was in effect.[10]

### B. The Sudden and Accidental Exception

A more difficult question is presented by the policies that undeniably include an exception to the pollution exclusion for damage from "sudden and accidental" discharges of pollutants. Specifically, these policies, which include the May 1987–May 1988 and May 1988–May 1989 Sentry policies, contain a pollution exclusion that states that the exclusion "does not apply if such discharge, dispersal, release or escape [of pollutants] is sudden and accidental." Thus, to determine whether the underlying suit triggered a duty to defend under these policies, it is necessary to consider whether the underlying complaint's allegations included releases of PCE that could be characterized as "sudden and accidental." The meaning of "sudden and accidental" in this context has been hotly debated in the courts,[11] and the Supreme Court of Virginia has not yet addressed the issue.[12] The debate focuses on whether the word "sudden" adds a temporal component to the exception, so that the phrase "sudden and accidental" would mean both "unexpected and unintended"—synonyms of "accidental"—*and* "abrupt or quick," the temporal meaning of "sudden." *See Quaker State,* 52 F.3d at 1527 n. 2. The majority of courts addressing the issue have concluded that "sudden" does add a temporal component to the exception,[13] but courts in several jurisdictions have reached a contrary conclusion, holding that the term "sudden," when used with "accidental," is ambiguous and thus, the phrase,

---

9. Whether or not the pollution damage or defense costs may be reasonably apportioned between covered and non-covered periods, it is clear that an insurer has a duty to defend the entire suit, including claims for damages attributable to the non-covered period. *See Gulf Chemical,* 1 F.3d at 372 (holding that the insurer's duty to defend is not diminished by the fact that the insured was without coverage during part of the relevant period). While these circumstances might appear to give rise to a conflict of interest between the insurer and its insured, courts have concluded otherwise, given the insurer's absolute duty to protect the insured's interests. *See Forty–Eight Insulations,* 633 F.2d at 1225 n. 25.

10. *See supra* note 5 (noting that the majority of courts allocate the costs of remediating the contamination equally over the years between the commencement of the contamination and its discovery or remediation).

11. *See Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1527 n. 2 (10th Cir.1995) ("The interpretation of the phrase 'sudden and accidental' within the pollution exclusion clause has split the courts.").

12. *See Monticello Ins. Co. v. Baecher,* 857 F.Supp. 1145, 1149 (E.D.Va.1994) ("'[N]o Virginia court has interpreted the standard Pollution Exclusion."). To this day, there has been no reported Supreme Court of Virginia decision interpreting this language.

13. *See, e.g., Quaker State,* 52 F.3d at 1527 (Utah law); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 153–54 (7th Cir.1994) (Indiana law); *Aeroquip Corp. v. Aetna Cas. & Sur. Co.,* 26 F.3d 893, 894 (9th Cir.1994) (California law); *Sokoloski v. American West Ins. Co.,* 294 Mont. 210, 980 P.2d 1043, 1045 (1999); *American Motorists Ins. Co. v. ARTRA Group,* 338 Md. 560, 659 A.2d 1295, 1308 (1995).

construed in favor of the insured, means simply "unexpected and unintended."[14]

 The sounder interpretation of the phrase "sudden and accidental," and the one adopted by the majority of jurisdictions, is that the phrase means both unexpected and unintended *and* quick or abrupt. This interpretation is the most accurate because it gives effect to both words in the phrase. Under Virginia law, courts must give effect to every provision in an insurance policy and no word is to be treated as meaningless. *See American Health Ins. Corp. v. Newcomb,* 197 Va. 836, 91 S.E.2d 447, 451 (1956); *Nations-Bank, N.A. v. Raney,* 1998 WL 713803, at *4 (W.D.Va. Oct.1, 1998) (unpublished disposition). Thus, in reading the phrase "sudden and accidental," both terms must be given meaning. It is uncontroversial that "accidental" means "occurring unexpectedly and unintentionally." *See* Webster's II New Riverside University Dictionary 71 (1984); *see also Quaker State,* 52 F.3d at 1527. "Sudden," therefore must add something to the phrase; to read it otherwise would render the word mere surplusage. *See Quaker State,* 52 F.3d at 1527–28. Indeed, "the very use of the two words 'sudden' and 'accidental' reveals a clear intent to define them to state two *separate* requirements, so that 'sudden' means more than 'unexpected.' " *See Sokoloski,* 980 P.2d at 1045 (emphasis added). "Sudden," therefore, must be given its temporal meaning of "abrupt" or "quick." *See* Webster's II New Riverside University Dictionary 1157; *see also Quaker State,* 52 F.3d at 1528; *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.,* 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992) ("unless

'sudden' is interpreted to have a temporal aspect, the word does not add anything to the phrase 'sudden and accidental' "). Given this definition, the coverage of the policies containing the "sudden and accidental" language is triggered by the underlying complaint only if the alleged discharges were both (i) unexpected and unintended and (ii) quick or abrupt.

 The underlying complaint, reasonably read, includes allegations of sufficient breadth to encompass releases that are both sudden and accidental. Thus, the underlying complaint alleged that "during the operation of the Facility, [plaintiffs], their employees, agents or others acting on their behalf *spilled or released* PCE and *discharged* PCE ... into the environment." (emphasis added). Also alleged was that "there may have been other, additional releases by [plaintiffs], their employees, agents or suppliers inside or outside of the Facility." The terms "spilled," "released," and "discharged" describe a broad continuum of pollution events that include abrupt or quick, unintentional spills or discharges, as well as those that are otherwise.[15] Thus, allegations employing these terms were sufficient to trigger Sentry's duty to defend plaintiffs against the Greenbriar lawsuit, because "the obligation to defend ... arises whenever the complaint alleges facts and circumstances, *some of which,* if proved, fall within the risk covered by the policy." *See VEPCO,* 475 S.E.2d at 265–66 (emphasis added). Consequently, as the Greenbriar complaint included allegations of sudden and accidental discharges, which fall within the exception to the pollution exclusion contained in the 1987–1989 Sentry insurance policies,

14. *See, e.g., Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Morton Int'l, Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 629 A.2d 831 (1993); *Queen City Farms, Inc. v. Central Nat. Ins. Co. of Omaha,* 126 Wash.2d 50, 882 P.2d 703 (1994); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.,* 187 W.Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation,*

*Ltd.,* 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (1990).

15. Among the many meanings of the word spill is "to cause or to allow to pour, splash or fall out (as over the edge of a container) and be wasted, lost or scattered." Webster's Third New International Dictionary 2195 (1993).

Sentry had a duty to defend plaintiffs against the Greenbriar lawsuit.

Attempting to avoid this result, Sentry argues, unpersuasively, that the underlying complaint alleges not sudden and accidental PCE discharges, but rather a continuous pattern of discharges during the time plaintiffs were in business at Store No. 8. The underlying complaint itself refutes this argument. It nowhere alleges that the PCE discharges occurred as a continuous pattern or that the allegations are limited to such a pattern; instead, as previously noted, the underlying complaint uses terms ("spilled," "discharged," "released") which encompass releases that are sudden and accidental, as well as releases that are part of a continuous pattern. In short, the underlying complaint does not specify whether these releases were isolated incidents or a continuous pattern.

It is certainly true, as Sentry argues, that some courts have found that a continuous pattern of individually sudden and accidental releases does not fall within the exception for "sudden and accidental" discharges.[16] And, it is also true that Sentry may ultimately succeed in proving that all or a portion of the Greenbriar settlement is attributable to damages owing to a continuous pattern of PCE pollution that occurred during the 1987–89 coverage period, in which event Sentry would have no duty to indemnify plaintiffs for this portion of the settlement. But this litigation has not yet reached that stage. At this stage, the inquiry is not whether the releases were in fact sudden and accidental, but simply whether the underlying complaint's allegations reasonably included sudden and accidental releases of PCE. *See St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F.Supp. 155, 160 (E.D.Va.1993) (an insurer's "duty to defend is determined solely by examining whether the complaint's allegations fall within the scope of the policy's coverage"); *VEPCO*, 475 S.E.2d at 265–66. They did so, and this triggered Sentry's duty to defend plaintiffs in the Greenbriar suit.

### C. The Pollution Liability Insurance

The final group of policies in issue are the Sentry policies in effect from 1991 to 1995, each of which contained a provision under the heading "Dry Cleaners Additional Coverage." This provision replaced the previous pollution exclusion and provided pollution liability insurance for injury or property damage arising from the discharge or release of pollutants. By its terms, this provision provided insurance coverage for precisely the type of damage alleged in the Greenbriar complaint, namely property damage in the form of soil and groundwater contamination from the release of PCE. Therefore, even assuming there were no other Sentry policies that triggered Sentry's duty to defend plaintiffs, the pollution coverage afforded in the 1991 through 1995 policies provides an alternative basis for concluding that Sentry had a duty to defend plaintiffs against the Greenbriar lawsuit.

Against this conclusion, Sentry offers two arguments, both unpersuasive. First, Sentry argues that the pollution liability insurance contained in the 1991 through 1995 policies is not applicable to plaintiffs' claim because the pollution first manifested itself before the period covered by these policies. In support, Sentry points out that the pollution liability insurance provision in these policies states, in pertinent part, that "[f]or purposes of pollution liability, ... occurrence is the date on which ... 'property damage' first manifests itself. The policy in effect at that time, and no other shall apply to the ... 'property damage.'" Sentry claims that the property damage "first manifest[ed] itself" when PCE was first released, and

---

**16.** *See Quaker State,* 52 F.3d at 1529 ("[T]he fact that individual discharges may have occurred both suddenly and accidentally when viewed in isolation does not alter the conclusion that the overall pattern of discharges was not 'sudden and accidental.' "); *Flanders Elec. Motor Serv.,* 40 F.3d at 154.

according to the allegations in the underlying complaint, PCE was released as early as 1989,[17] long before the 1991–1995 policies became effective. The flaw in this argument is that it is based on an excessively narrow view of damage manifestation. While the damage caused by the PCE contamination *began* when the first PCE was released, each time additional PCE was released, more property damage occurred. In other words, the property damage caused by the 1991 releases first manifested itself in 1991, as each release occurred. Simply because there may have been prior damage caused by earlier PCE contamination does not mean that subsequent releases did not cause damage that "first manifested itself" at the time of those later releases. In sum, because the underlying complaint alleged that PCE releases occurred throughout the 1991–1995 period, the pollution liability insurance provisions apply to the Greenbriar complaint.

■ Second, Sentry argues that the pollution liability insurance is not applicable because the Greenbriar suit requested that plaintiffs be ordered to clean up the Greenbriar site, and such actions are explicitly excluded from coverage under the pollution liability insurance. Indeed, the pollution liability insurance contains an exclusion for "any loss, cost or expense arising from any direction or request that you [the insured] test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." The Greenbriar complaint, however, cannot be characterized simply as a "direction or request" that the plaintiffs clean up the PCE contamination. While the Greenbriar complaint did contain a request for an order directing the plaintiffs "to undertake appropriate action

to remove or remedy the contamination," it also sought an order declaring that the plaintiffs were liable "for payment of all costs incurred by [Greenbriar] relating to the investigation, remediation or removal of contamination at the Property." In other words, the Greenbriar complaint contained requests that the plaintiffs reimburse Greenbriar for costs that it incurred, or would incur, in investigating and remediating the property. This request for damages is plainly within the scope of the pollution liability insurance provisions contained in the 1991–1995 policies. Sentry, therefore, had a duty to defend plaintiffs because only "where it appears clearly that [the insured] would not be liable under its contract for any judgment based upon the allegations, does the company have no duty to defend." *Parker v. Hartford Fire Ins. Co.*, 222 Va. 33, 278 S.E.2d 803, 804 (1981) (internal quotation marks omitted).

### D. An Action for Damages

■ Sentry argues that, independent of the various pollution exclusions, it had no duty to defend plaintiffs in the Greenbriar suit, because that suit was not a claim for "damages," within the scope of any of the Sentry policies. All of the Sentry policies explicitly limit coverage to claims against the insured *for damages.* The policies state, in pertinent part, that Sentry "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies."[18] Sentry argues that the Greenbriar suit sought reimbursement for the costs of environmental remediation which Greenbriar was forced to undertake to complete the sale of the shopping center, and that an action for

---

**17.** The Greenbriar complaint contained allegations that in 1989 a Fairfax Count Health inspector inspected plaintiffs' store site and determined that at least ten releases of PCE had occurred. While plaintiffs dispute the truth of this allegation, in determining the duty to defend, the inquiry is limited by the allegations in the underlying complaint, regardless of their accuracy. *See St. Paul,* 826 F.Supp. at 160.

**18.** This language comes from the 1987–1990 Sentry policies. The 1990–1996 Sentry policies contain an almost identical provision, worded slightly differently.

reimbursement, or restitution, is not an action for "damages." In support of this argument, Sentry relies on case law that has arisen in a different context, namely that of proceedings brought by governmental agencies to compel polluters to clean up contaminated sites.

There is no Virginia law on this issue, and courts in other jurisdictions are split on the question whether waste site remediation costs constitute damages within the meaning of a comprehensive general liability insurance policy. Many courts have held that environmental cleanup costs constitute "damages" because the terms of an insurance policy are to be construed according to their plain and ordinary meaning, and the term "damages," as ordinarily understood, encompasses environmental remediation costs which are, in effect, monies paid as the result of a legal or administrative claim and which constitute a form of compensation. *See Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1319 (S.D.N.Y.1988) ("The average businessman does not differentiate between 'damages' and 'restitution;' in either case, money comes from his pocket and goes to third parties.").[19] Other courts, however, have held that claims for equitable relief, such as restitution, are not claims for damages within the meaning of insurance contracts because the term "damages" must be construed in accordance with its technical meaning in the law. *See, e.g., Continental Ins. Co. v. Northeastern Pharm. & Chem. Co.*, 842

F.2d 977, 985 (8th Cir.1988) (Missouri law); *Maryland Cas. Co. v. Armco*, 822 F.2d 1348, 1352 (4th Cir.1987) (Maryland law).[20]

■ The sounder conclusion, and the one followed by the majority of courts,[21] is that environmental remediation costs constitute damages within the meaning of a comprehensive general liability insurance policy, such as the policies here in issue. This is particularly true where, as here, the suit is brought by a private party seeking to recover the clean-up costs it incurred, as opposed to one brought by a governmental agency seeking to compel a polluter to pay to remediate pollution damage. Under Virginia law, terms in an insurance contract are to be read in accordance with their plain and ordinary meaning. *See Osborne v. National Union Fire Ins. Co.*, 251 Va. 53, 56, 465 S.E.2d 835, 837 (1996) ("When the terms of an insurance policy are clear and unambiguous, we give the words their ordinary meaning and enforce the policy as written."). The ordinary and plain meaning of damages is "money claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary 393 (7th ed.1999). Under this definition, the Greenbriar suit clearly was an action for damages. According to the underlying complaint, Greenbriar sustained a loss, namely the cost of remedying the PCE contamination, as the result of plaintiffs' allegedly unlawful actions in releasing the PCE, and Greenbriar sought compensa-

---

**19.** *See, e.g., Aetna Casualty & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir.1991) (Idaho law); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030 (2d Cir.1991) (Vermont law); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 944 F.2d 940, 947 (D.C.Cir.1991) (Missouri law); *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1288 (D.Utah 1994), *aff'd* 52 F.3d 1522, 1527 n. 2 (10th Cir.1995) (Utah law).

**20.** Importantly, the authority of *Armco* has been eroded by subsequent developments. In *Bausch & Lomb v. Utica Mut. Ins. Co.*, the highest court of Maryland declined to adopt the Fourth Circuit's interpretation of Maryland law, holding that "[t]o the extent it suggests that the term 'damages' imports a distinctly legal meaning in insurance matters, *Armco* misperceives the law of Maryland." 330 Md. 758, 625 A.2d 1021, 1032–33 (1993).

**21.** *See Morton Intern., Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831, 845 (1993) ("The clear weight of authority ... among both federal and state courts adopts the view that the undefined term 'damages' ... should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental damage....").

tion for that loss. Given this, the Greenbriar suit is plainly a claim for "damages," as that term is commonly understood. Furthermore, under Virginia law, to the extent that the policies' reference to damages is ambiguous, the ambiguity must be resolved in favor of granting coverage. *See Town Crier*, 721 F.Supp. at 101 ("[A]mbiguous coverage clauses are generally construed to grant coverage rather than deny it."). In sum, Sentry's reading of the term "damages" in its policies is both overly restrictive and inconsistent with the plain and ordinary meaning of the word.

### IV.

With respect to Sentry's motion for summary judgment on its duty to indemnify plaintiffs in the Greenbriar suit, the factual record is insufficiently developed at this point to grant summary judgment for either side. Generally, a duty to indemnify "springs from the facts actually discovered or proven at trial." *See Liberty Life Ins. Co. v. Travelers Indemnity Co.*, 181 F.3d 88, 1999 WL 417436, at *4 (4th Cir. 1999) (unpublished disposition). Here, then, Sentry would have a duty to indemnify plaintiffs only if plaintiffs succeeded in proving that the circumstances surrounding the PCE releases actually fell within the scope of the coverage of the 1987 and 1988 policies, or the 1991 through 1995 policies. There is little evidence in the record on the actual nature of the PCE releases; instead, the record is limited to the nature of the allegations in the underlying complaint, which, while relevant to the duty to defend, are insufficient to resolve the question of the duty to indemnify. As a result, the determination of Sentry's duty to indemnify plaintiffs must await further factual development. In any event, as previously noted, Sentry would have no duty to indemnify plaintiffs for any damage attributable to PCE contamination that occurred while the policies containing the absolute pollution exclusion were in effect.

### V.

For the foregoing reasons, an order will issue as follows:

1. Summary judgment is granted in favor of Harleysville on both the duty to defend and the duty to indemnify plaintiffs in the Greenbriar suit. Harleysville is therefore dismissed from this action.

2. Summary judgment is granted for plaintiffs on the issue of Sentry's duty to defend plaintiffs under the 1987 and 1988 policies containing the "sudden and accidental" exception, and the 1991–1995 policies containing the pollution liability insurance. The determination of the amount of the award to plaintiffs, including whether the defense costs attributable to the non-covered periods may be apportioned to plaintiffs, must await further developments in the record.

3. Summary judgment is denied on the issue of Sentry's duty to indemnify plaintiffs because the factual record concerning the duty to indemnify is insufficiently developed at this juncture.