The **MORROW CORPORATION,** et al., Plaintiffs,

v.

**HARLEYSVILLE MUTUAL INSURANCE CO.,** et al., **Defendants.**

**No. Civ.A. 99–1782–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 24, 2000.

---

Michael O. Hill, Joseph James Green, Collier, Shannon, Rill & Scott, P.L.L.C., Washington, DC, for plaintiffs.

Richard W. Driscoll, Eccleston and Wolf, Washington, DC, for defendant Sentry.

Edward Harrison Grove, III, Brault, Palmer, Grove, Zimmerman, White & Mims, Fairfax, VA, for defendant Harleysville.

## MEMORANDUM OPINION

ELLIS, District Judge.

The matter is before the Court on the motion of defendant Sentry Insurance Co. ("Sentry") to alter or amend this Court's Memorandum Opinion and Order of June 22, 2000 pursuant to Rules 52(b) and 59(e),

Fed.R.Civ.P. *See Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F.Supp.2d 422 (E.D.Va.2000) (*"Morrow I"*). Sentry also has asked for a clarification of the holding in *Morrow I* that Sentry had a duty to defend plaintiffs against a lawsuit seeking to hold plaintiffs liable for pollution damage. Contemporaneous with the filing of this motion, Sentry filed a supporting memorandum of law, and plaintiffs thereafter filed a memorandum in response, to which Sentry, in turn, has responded. Thus, the matter is now ripe for disposition. Oral argument is dispensed with as the facts and legal contentions are adequately presented in the current record and further oral argument would not aid the decisional process.

## I.

Although the facts are fully set forth in *Morrow I*, a brief restatement of the essential facts is nonetheless warranted here.

The record discloses that plaintiffs operated a "plant-on-premises" dry-cleaning business at the Greenbriar Town Shopping Center in Chantilly, Virginia, from May 1986 until 1996. In the course of conducting their dry-cleaning business, plaintiffs used a solvent containing perchloroethylene ("PCE"), a toxic and hazardous chemical that is regulated by the United States Environmental Protection Agency and the Virginia Department of Environmental Quality. In 1996, Greenbriar Limited Partnership ("Greenbriar"), the shopping center operator, conducted a site examination as part of the sale of the shopping center and thereby discovered PCE contamination in the soil and groundwater under the plaintiffs' leased store location, where they operated the dry-cleaning business from May 1986 to May 1992.[1] Greenbriar thereafter sued plaintiffs, *inter alia*, for damages and injunctive relief re-quiring plaintiffs to remedy, or to bear the costs of remedying, the alleged PCE pollution damage.[2] Plaintiffs consequently sought from their insurers, Sentry and Harleysville Mutual Insurance Co. ("Harleysville"), a defense against the suit and indemnification for any losses pursuant to all of their insurance policies. Both declined to defend or indemnify plaintiffs against the Greenbriar claims, citing pollution exclusion clauses contained in the policies as the basis for the refusal. Lacking the resources to defend the Greenbriar suit, plaintiffs settled the case in August 1999.

Plaintiffs brought the instant action against Sentry & Harleysville in November 1999 for declaratory relief and breach of contract arising from the insurers' failure to defend and indemnify plaintiffs against the Greenbriar suit. Plaintiffs then filed a motion for partial summary judgment as to both insurers' duty to defend, and each insurer filed a cross-motion for summary judgment on both the duty to defend and the duty to indemnify. These motions were granted in part and denied in part in *Morrow I*. In essence, summary judgment was granted for Harleysville on both the duty to defend and the duty to indemnify, and Harleysville was therefore dismissed from this action. Summary judgment, in addition, was granted in favor of plaintiffs on Sentry's duty to defend but was denied on the duty to indemnify, as the factual record was insufficiently developed at that juncture. *See id.* at 424–26, 429, 435.

The instant motion only involves comprehensive general liability ("CGL") insurance policies issued by Sentry that were in effect from May 1991 through May 1995. Each of these CGL policies provided occurrence-based pollution liability insurance for bodily injury or property damage arising from "the actual, alleged or threatened

---

1. In 1992, plaintiffs moved their business to another location in the shopping center, where they continued to operate until 1996.

2. The complaint in the Greenbriar suit is referred to hereafter as the "underlying Greenbriar complaint."

discharge, dispersal, release or escape of pollutants" under a provision entitled "Dry, Cleaners Additional Coverage."[3] Specifically, these policies required an "occurrence" of bodily injury or property damage to trigger coverage, and the policies defined an "occurrence" as "the date on which bodily injury or property damage first manifests itself." The question of when these policies—and Sentry's concomitant duty to defend plaintiffs—are triggered, therefore, turns on when "bodily injury or property damage first manifests itself."

The target of Sentry's motion is the ruling in *Morrow I* granting summary judgment to plaintiffs on Sentry's duty to defend plaintiffs under the 1991 through 1995 Sentry policies. *See id.* at 429–35. Specifically, Sentry attacks the ruling that Sentry was obligated to defend plaintiffs against the underlying Greenbriar suit under each of the Sentry policies in effect between 1991 and 1995, because the property damage from the pollution that occurred during each of those years may have first become manifest in each of the years. *See id.* at 432–33. This ruling, in Sentry's view, is manifestly erroneous and must be altered or amended pursuant to Rule 52(b), Fed.R.Civ.P.[4] In addition, Sentry seeks a clarification as to whether Sentry, under *Morrow I*, is obligated to pay the defense costs for claims relating to periods of time in which no applicable policy was in effect. Each of these matters is separately addressed in light of the appli-

cable standard under the Rules, as well as the governing substantive law.

## II.

### A. Sentry's Request for Clarification

The requested clarification is addressed first, as it is easily laid to rest. *Morrow I* discusses the issue of apportioning defense costs between Sentry and plaintiffs because Sentry had a duty to defend under some, but not all, of the policies implicated by the underlying complaint. *See id.* at 429–30. In essence, the majority rule, which Virginia would likely adopt, is that, where there is a reasonable means of prorating the costs of defense, the insured must pay its fair share for the defense of the non-covered risk. *See id.* And where, as here, the current factual record is insufficiently developed to permit a determination as to whether defense costs may be reasonably apportioned between Sentry and plaintiffs, the specific apportionment issue must await further factual development. *See id.*

In any event, however, an insurer has a duty to defend the insured against the entire suit, including claims for damages attributable to the non-covered period, regardless of whether the defense costs may be reasonably apportioned between the covered and non-covered periods. *See id.* at 430 n. 9. Put differently, where the insurer has a duty to defend an insured against part of an underlying suit, the insurer may not mount a defense that is limited to the claims that implicate the

---

**3.** Coverage was limited to exclude "any loss, cost or expense arising from any direction or request that [the insured] test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." For reasons stated in *Morrow I*, however, this limitation is inapplicable to this case. *See Morrow I*, 101 F.Supp.2d at 433.

**4.** Under Rule 52(b), a party may move, no later than ten days after entry of judgment, for an order amending or adding to the court's findings and amending the judgment accordingly. Fed.R.Civ.P. 52(b). Among the purposes of such a motion is to correct mani-

fest errors of law or fact. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir.1986). Under Rule 59(e), a party may move, no later than ten days after entry of judgment, to alter or amend that judgment. Fed.R.Civ.P. 59(e). Among the grounds recognized for such a motion is the correction of a clear error of law or prevention of manifest injustice. *See Pacific Ins. Co. v. American Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir.1998); *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir.1997); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 24 F.Supp.2d 537, 539 (E.D.Va.1998).

periods of coverage and thereby require the insured to provide its own defense for the periods of non-coverage. Rather, because of the insurer's absolute duty to protect the insured's interests, the insurer must provide a defense for the entire claim against the insured. *See Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212, 1225 n. 25 (6th Cir.1980). This is true even though some of the *costs* of that defense may ultimately be apportioned to the insured for the periods of non-coverage. This issue is adequately addressed in *Morrow I,* and no further clarification is needed.

### B. Sentry's Motion to Amend or Alter

The second argument raised in Sentry's motion merits more discussion, as it was neither raised by Sentry in the original summary judgment motion nor pressed in subsequent pleadings[5] and was therefore not addressed in *Morrow I.* To recapitulate briefly, Sentry chiefly argued on summary judgment that the 1991 through 1995 policies were not implicated by the underlying Greenbriar complaint because the pollution liability insurance in those policies was limited to property damage that first manifested itself in the applicable policy year, whereas the underlying Greenbriar complaint alleged that plaintiffs were aware of PCE contamination as early as 1989, two years before the first policy containing the pollution liability insurance took effect. Thus, went Sentry's principal summary judgment argument, because plaintiffs were aware of the PCE

contamination in 1989, the 1991 through 1995 Sentry policies—and Sentry's duty to defend—were not implicated. This argument was rejected in *Morrow I* on the ground that "[w]hile the damage caused by the PCE contamination *began* when the first PCE was released, each time additional PCE was released, more property damage occurred. In other words, the property damage caused by the 1991 releases first manifested itself in 1991, as each release occurred." *Id.* at 433. Now, in the motion at bar, Sentry changes tack and argues that the property damage caused by the PCE contamination "first manifest[ed] itself," not in 1989, but in 1996, when Greenbriar first *discovered* the contamination, and that, as a result, no duty to defend arose under the 1991 through 1995 policies. This argument, too, fails for the reasons that follow.

■ It is established in Virginia that the duty to defend is broader than the duty to indemnify. *See, e.g., VEPCO v. Northbrook Property & Cas. Ins.,* 252 Va. 265, 475 S.E.2d 264, 265 (1996). Under Virginia law, the duty to defend arises whenever the complaint against the insured " ' alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy.' " *VEPCO,* 475 S.E.2d at 265 (quoting *Lerner v. Safeco,* 219 Va. 101, 245 S.E.2d 249, 251 (1978)). It follows that an insurer has no duty to defend the insured when, "under the allegations of the complaint, it would not be liable under its contract for any

---

**5.** Sentry did not raise this argument in its pre-hearing pleadings; instead, it first raised the argument in its post-hearing brief, in which it argued:

> The complaint in the underlying litigation alleges, at ¶ 16, that spills of PCE had been noted in April of 1989. This was prior to the inception of any of the policies which provided Pollution Liability Insurance, and so no Sentry policy could provide coverage. Furthermore, ¶ 11 of the complaint in the underlying litigation alleges that an environmental assessment was conducted by Hygienetics, Inc. in 1996 and, significantly, "the Hygienetics' report in 1996 was the

first time Greenbriar LP learned of the PCE contamination at and emanating from the Facility." This was after expiration of the last Sentry policy with Pollution Liability Insurance. Nothing relating to the contamination occurred between 1991 and 1995, when Sentry's Pollution Liability Insurance was in effect. Therefore, regardless of what the Court considers to constitute "manifestation," it did not take place during the period 1991–95, when the Pollution Liability Insurance was in effect.

Post–Hearing Brief of Sentry Insurance A Mutual Company, at 3–4.

recovery therein had." *Id.* at 266, 475 S.E.2d 264 (quoting *Lerner,* 245 S.E.2d at 251). Thus, if allegations in the complaint might support a judgment for which the insurer would be liable to indemnify the insured, the insurer has a duty to defend the insured, for "[o]nly when 'it appears clearly [the insurer] would not be liable under its contract for any judgment based upon the allegations,' does the company have no duty to defend." *Parker v. Hartford Fire Ins. Co.,* 222 Va. 33, 278 S.E.2d 803, 804 (1981) (quoting *Travelers v. Obenshain,* 219 Va. 44, 245 S.E.2d 247, 249 (1978)) (emphasis omitted). Consequently,

> if those allegations leave it in doubt whether the case alleged is covered by the policy, the refusal of the insurance company to defend is at its own risk; and if it turns out on development of the facts that the case is covered by the policy, the insurance company is necessarily liable for breach of its covenant to defend.

*London Guar. Co. v. C. B. White & Bros.,* 188 Va. 195, 49 S.E.2d 254, 256 (1948). In sum, to determine whether an insurer has a duty to defend an insured against a suit, a court must determine whether any of the claims asserted in the suit fall within the policy's scope of coverage. *See, e.g., Town Crier, Inc. v. Hume,* 721 F.Supp. 99, 102 (E.D.Va.1989). This is accomplished by comparing the policy terms defining the scope of coverage with the allegations in the lawsuit's complaint. *See id.* at 103.

Given these principles, it follows that an assessment of Sentry's argument involves a comparison of the pollution liability provisions in the 1991 through 1995 policies with the pollution damage allegations of the underlying Greenbriar complaint. And, in this regard, the starting point in the analysis is to elucidate the scope of coverage of the policies, each of which specifies, in identical terms, that a covered "occurrence" arises only when property damage "first manifests itself."

Pollution insurance coverage disputes focusing on the term "occurrence" are old hat in the courts. For years courts have endeavored to define the term "occurrence" in CGL policies.[6] Despite these long-standing efforts, however, courts remain sharply divided on the issue.[7] In general, courts have adopted—and are heavily split as to the appropriate choice of—one of four general "trigger theories" based on different constructions of a covered "occurrence" in CGL policies. *See Gelman Sciences, Inc. v. Fidelity & Cas. Co. of N.Y.,* 1998 WL 795216 (Mich. Jan.21, 1998) (en banc) (outlining the four theories). Some courts have adopted an "exposure" theory, under which there is a covered "occurrence" and the liability policy is triggered whenever there is exposure to an injury or damage-causing event during the policy period.[8] Other courts have adopted a "continuous trigger" theory of coverage, under which all insurance policies in effect from the date of the initial

---

**6.** Typically, insurance coverage cases involve the discovery of bodily injury or property damage contemporaneous with the event or negligent act that caused them, as in automobile collisions or building fires. Products liability and environmental coverage cases, however, often involve injury or damage that is not discovered or does not become known until well after the causal event. Courts, therefore, have had to decide when or under what circumstances an event or negligent act constitutes an "occurrence" that triggers the insurer's duty to indemnify and, concomitantly, its duty to defend.

**7.** *See generally* Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 8.10, at 599–600 (de-

scribing exposure, manifestation, and multiple trigger theories); Tung Yin, *Nailing Jello to a Wall: A Uniform Approach for Adjudicating Insurance Coverage Disputes in Products Liability Cases with Delayed Manifestation Injuries and Damages,* 83 Calif.L.Rev. 1243 (1995) (surveying cases).

**8.** *See, e.g., Continental Ins. Cos. v. North-eastern Pharm. & Chem. Co.,* 842 F.2d 977 (8th Cir.1988) (in banc); *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980), *clarified on other grounds on reh'g,* 657 F.2d 814 (1981); *TBG, Inc. v. Commercial Union Ins. Co.,* 806 F.Supp. 1444, 1451–52 (N.D.Cal.1990).

exposure to a damage-causing agent, through any period of progressive or continuous damage, and up to the time the damage is discovered, are triggered.[9] Still other courts have followed a third approach to defining a covered "occurrence"—namely, the "injury-in-fact" theory—under which coverage is triggered when damage actually occurs, regardless of when it is discovered.[10] And, finally, some courts have adopted the "manifestation" theory, under which coverage is triggered at the time the damage to the property is discovered.[11]

▇ The Supreme Court of Virginia has not yet signaled which of these approaches it will adopt, or, indeed, whether it will adopt some other approach to determining what triggers pollution coverage under occurrence-based CGL policies. If this were the precise question presented here, its resolution would require either prediction of what course the Supreme Court of Virginia would choose[12] or certification of the matter to that court.[13] Yet, as it happens, this is not the precise question at bar, for each of the Sentry policies in issue, unlike many of the policies that have spawned the split in the courts over the meaning of "occurrence," contains a definition of "oc-

currence"; specifically, in the Sentry policies there is a covered pollution occurrence at the time the property damage "first manifests itself." Thus, the task at hand is not to decide what approach the Supreme Court of Virginia would adopt to define a covered pollution "occurrence" under a CGL policy that does not further define the term—a delicate and difficult task requiring a federal court to ascertain and give effect to the public policy of the Commonwealth and to survey the jurisprudence of sister states, all in an attempt to divine what the Supreme Court of Virginia would do if confronted with the issue.[14] Rather, the task at hand is the somewhat more modest one of contract interpretation—namely, determining when property damage from pollution contamination "first manifests itself." Here, too, there is no controlling Virginia precedent on the meaning of the phrase "first manifests itself" in the pollution damage context. Yet, there is ample guidance in Virginia law on the proper principles to employ in construing insurance policy language. Specifically, settled Virginia law teaches that insurance policies are "contracts whose terms are construed in accordance with the general principles applicable to all contracts."[15] In this regard, the contract lan-

**9.** See, e.g., Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034 (D.C.Cir.1981).

**10.** See, e.g., Maryland Cas. Co. v. W.R. Grace & Co., 23 F.3d 617, 624–28 (2d Cir.1993); Eljer Mfg., Inc. v. Liberty Mut. Ins. Co., 972 F.2d 805, 814 (7th Cir.1992); American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 764, aff'd and modified, 748 F.2d 760 (2d Cir.1984).

**11.** See, e.g., Armotek Indus. Inc. v. Employers Ins., 952 F.2d 756 (3d Cir.1991); Mraz v. Canadian Universal Ins. Co., 804 F.2d 1325, 1328 (4th Cir.1986) (Maryland law). But see Harford County v. Harford Mut. Ins. Co., 327 Md. 418, 436, 610 A.2d 286, 295 (1992) (rejecting manifestation theory of coverage).

**12.** See, e.g., Al–Abood v. El–Shamari, 217 F.3d 225, 237 (4th Cir.2000); Doe v. Doe, 973 F.2d 237, 240 (4th Cir.1992); RW Power Partners v. VEPCO, 899 F.Supp. 1490, 1501 n. 15 (E.D.Va.1995) ("When a federal court is sitting in diversity, it must 'apply the law of

Virginia as articulated by the Supreme Court of Virginia,' or as it 'predict[s] would be applied by the Supreme Court of Virginia were the case before it.' ").

**13.** See R.Sup.Ct.Va. 5:42 (prescribing procedures for certifications of questions of law).

**14.** See Wade v. Danek Med. Inc., 182 F.3d 281, 286 (4th Cir.1999) ("In the absence of any relevant Virginia law, we naturally look to the practices of other states in predicting how the Virginia Supreme Court would rule."); St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir.1995) ("[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy.").

**15.** Dairyland Ins. Co. v. Douthat, 248 Va. 627, 449 S.E.2d 799, 801 (1994); see, e.g., Allstate Ins. Co. v. Eaton, 248 Va. 426, 448 S.E.2d 652, 655 (1994); State Farm Fire & Cas. Co. v.

guage provides the primary—and, unless ambiguous, the ultimate—guidance on the meaning of its terms. *See, e.g., Partnership Umbrella, Inc. v. Federal Ins. Co.*, 530 S.E.2d 154, 160 (Va.2000) ("[W]hen the language in an insurance policy is clear and unambiguous, courts ... [must] give the language its plain and ordinary meaning and enforce the policy as written."). Under Virginia law, furthermore, a contract is unambiguous unless a term "may be understood in more than one way or when it refers to two or more things at the same time." *Smith v. Allstate Ins. Co.*, 241 Va. 477, 403 S.E.2d 696, 697 (1991) (internal quotation marks and citation omitted).[16]

■ In this case, the term used by the Sentry policies to define an "occurrence"—namely, "manifest"—supports a range of meanings. According to Webster's Third New International Dictionary, for example, "to manifest" means "to show plainly: [to] make palpably evident or certain by showing or displaying." Webster's Third New International Dictionary 1375 (1993). It further defines the adjective "manifest" as "capable of being readily and instantly perceived by the senses and esp[ecially] by sight: not hidden or concealed: open to view," or "capable of being easily understood or recognized at once by the mind: not obscure: obvious," or "being the part or aspect of a phenomenon that is directly observable." *Id.* And Black's Law Dictionary defines the term to mean "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden," and to be "synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evi-

dent, and self-evident." Black's Law Dictionary 867 (5th ed.1979). Other courts, including the Fourth Circuit, moreover, have defined "manifest" in the insurance context to mean "readily perceived or obvious."[17] It appears, therefore, that the term "manifest" has multiple—albeit subtle—variations in meaning.

Given this range of meaning, it cannot be gainsaid that some variations of the definition of "manifest" would simply be nonsensical if applied in the pollution damage context. In this case, for example, property damage caused by PCE contamination is never "obvious," "visible," "clear," or "open to view." Nor is such contamination ever "palpably evident" or "shown" or "displayed" to the human senses. Yet, this fact does not mean—nor does Sentry make the implausible argument—that because PCE contamination is never "obvious," "visible," "clear," or "open to view," the Sentry policies could never be triggered by PCE contamination. Obviously, there are some variations of the plain meaning of the term "manifest" that have no direct application in the pollution damage context. Thus, it remains to be determined in what way PCE contamination can be "manifest." Put differently, the term "manifest" in the Sentry policies must be given only the plain meaning of that term that makes sense in, or has some application to, the hazardous chemical pollution context. *See Gates, Hudson & Assocs. v. Federal Ins. Co.*, 141 F.3d 500, 502 (4th Cir.1997) (stating that a term must be examined "within its context" to determine the existence of ambiguity). Only in doing so is the parties' contractual intent given proper effect.

*Walton*, 244 Va. 498, 423 S.E.2d 188, 191 (1992); *see also General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir.1996) (applying Virginia law).

**16.** Conversely, "[a] term is unambiguous only if, within its context, it is not susceptible to more than one meaning." *Gates, Hudson & Assocs. v. Federal Ins. Co.*, 141 F.3d 500, 502 (4th Cir.1997) (applying Virginia law).

**17.** *General Analytics Corp. v. CNA Insurance Cos.*, 86 F.3d 51, 54 (4th Cir.1996) (interpreting an employee dishonesty insurance policy that required dishonest intent to be "manifest"); *see also, e.g., First Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co.*, 935 F.2d 1164, 1166 n. 3 (10th Cir.1991) (noting that courts have defined "manifest" to mean "to show plainly or make palpably evident or certain by showing or displaying").

Further scrutiny of the term "manifest" reveals that the range of meaning it supports is bounded and unified by a focus on the nature of the manifesting phenomenon. Specifically, "manifest," in all of its forms, connotes the self-revelation of the manifesting phenomenon and its *ability* to be perceived—that is, something manifests itself by becoming sufficiently susceptible to apprehension or comprehension. The term inquires into whether a phenomenon is of a sufficiently external nature as to be "readily perceived," and it is not necessary under any variation of the term's meaning that the manifesting phenomenon *actually be perceived or discovered.*[18] Rather, as with all phenomena that are in themselves manifest, perception or discovery requires an affirmative act of looking or otherwise taking whatever reasonable steps are re-

quired to perceive the manifesting phenomenon; a phenomenon's objective manifestation occurs independent of another's perception.[19] In other words, "manifest," in this sense, means *discoverable* or subject to being discovered by reasonable means, not actually *discovered* or perceived.

An application of the foregoing analysis to the instant case compels the conclusion that because the presence of PCE in soil or groundwater can only be detected by testing for the chemical—that is, it cannot be detected, seen, or otherwise "perceived" without conducting such tests—PCE contamination damage "manifests itself" when it reaches a detectable and legally significant level in soil or groundwater.[20] Thus, although the PCE contamination (as Sen-

18. In this regard, it bears noting that the Sentry policies refer to the date in which pollution damage "first manifests *itself,*" and does not otherwise specify that such manifestation must have occurred *to* the insureds, to Sentry, to Greenbriar, or, indeed, to anyone at all.

19. Employing as an illustration the familiar Koan of Zen Buddhism, "Does a tree that falls in a forest make a sound when there is no one around to hear it?" captures to a significant degree the objective and passive nature of the term "manifest," for under the definition of the term adduced above, the tree does in fact make a sound while falling—and the fall thereby manifests itself—regardless of whether one is present to perceive the fall's auditory manifestation. Thus, just as the tree's fall "manifests itself" by emitting a sound that can be heard, whether or not anyone is around to hear it, so, too, does a PCE discharge "manifest[ ] itself" by becoming discoverable or detectable by reasonable means, whether or not it is in fact contemporaneously detected by testing. Of course, whether such a discharge was manifest, *i.e.,* discoverable or detectable, requires predicate proof of a PCE discharge and expert opinion testimony that such a discharge was subject to discovery in the soil or groundwater by reasonable testing.

20. This application of an objective and passive definition of "manifest" is bolstered by the fact that none of the Virginia cases cited by Sentry goes so far as to use "manifest" to require the actual perception of the manifesting phenomenon by another. *See Snyder-*

*Falkinham v. Stockburger,* 249 Va. 376, 457 S.E.2d 36, 39 (1995) ("Ultimate resolution of the question whether there has been a binding settlement involves a determination of the parties' intention, as objectively manifested."); *Montagna v. Holiday Inns,* 221 Va. 336, 269 S.E.2d 838, 844 (1980) ("The issue is always ultimately resolved by a 'determination of the intention of the parties, as objectively manifested' "); *Board of Zoning Appeals v. CaseLin Sys.,* 256 Va. 206, 501 S.E.2d 397, 401 (1998) ("Neither the granting of a variance nor the previous rezoning of a particular property is a sufficient manifestation of 'approval' under the bright line test."); *King v. Sowers,* 252 Va. 71, 471 S.E.2d 481, 483 (1996) ("[The doctors] should have recognized the symptoms as soon as they manifested themselves...."); *Sussex Community Servs. Ass'n v. Virginia Soc. for Mentally Retarded Children,* 251 Va. 240, 467 S.E.2d 468, 470 (1996) ("These amendments manifest a clear intent of the General Assembly to apply subsection C to restrictive covenants...."). In each of these cases, the use of "manifest" by the Virginia court was consistent with plain meaning of the word, as adduced above—that is, the court used "manifest" to indicate that the phenomenon at issue was plainly shown, palpably evident, capable of being readily and instantly perceived or understood, obvious, or apparent. Such use of "manifest" by Virginia courts, therefore, when considered in light of the plain and ordinary meaning of the term, also compels the conclusion that "manifest" as used in the Sentry policies only requires that the instances of PCE contamination be discoverable.

try now argues) was not *actually known or discovered* by Greenbriar until 1996 (after the expiration of the Sentry policies), it may have "manifested itself"—that is, it may have been discoverable through reasonable testing—during the effective terms of each of the Sentry policies.[21]

 Even if, as Sentry urges, "manifest" could be taken also to mean "discovered," there would be, at most, an ambiguity in the meaning of "manifest" in this case, because "discoverable," as shown *supra*, is at the very least an equally plausible definition of the term.[22] The existence of such an ambiguity requires application of well-settled rules of construction as aids in the interpretive enterprise. *See, e.g., Partnership Umbrella,* 530 S.E.2d at 160 (holding that rules of contract construction are to be applied where the language used is ambiguous); *State Farm Fire & Cas. Co. v. Walton,* 244 Va. 498, 423 S.E.2d 188, 191 (1992) (same).

 An ambiguous term must be accorded the meaning that a reasonable person in the position of the insured would have given to the term and that is consistent with the reasonable expectations of a person in the insured's position, for it is well-settled in Virginia and in all other jurisdictions that ambiguities in meaning are resolved in favor of the insured. *See, e.g., St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.,* 227 Va. 407, 316 S.E.2d 734, 735–36 (1984). This is so because an insurer generally drafts and ultimately is responsible for the language in an insurance contract, and any ambiguities in the drafter's choice of language are

---

**21.** Sentry argues that the term "manifest" means "apparent," "revealed," or "known," and that, thus, the property damage caused by the PCE contamination did not "manifest itself" until 1996, when it was first *discovered* by Greenbriar. Accordingly, Sentry argues that none of the 1991 through 1995 policies were triggered by the allegations in the underlying Greenbriar complaint. Yet, as shown above, "manifest" only means discover*able,* and not discover*ed.* It bears noting, moreover, that even the term "apparent" does not require actual and affirmative third-party perception of the apparent phenomenon. "Apparent," according to Webster's, means *"capable* of easy perception," *"readily perceptible* to the senses," "open to ready observation or full view," and "capable of being readily perceived by the sensibilities or understanding as certainly existent or present." Webster's Third New International Dictionary 102–03 (1993) (emphasis added). Like "manifest," therefore, "apparent" focuses on the quality and nature of the phenomenon and its discoverability; it does not require actual discovery, perception, or apprehension.

**22.** It is true that courts have held that the plain and ordinary meaning of language in an insurance contract may be disregarded where the language to be construed has, in commercial usage or by uniform judicial construction, acquired a clear and definite technical meaning. *See, e.g., Harris v. State Farm Mut. Auto. Ins. Co.,* 232 F.2d 532, 536 (6th Cir.1956); *Parker v. Provident Life & Accident Ins. Co.,* 582 S.W.2d 380, 383 (Tenn.1979); *Lineberry v. Security Life & Trust Co.,* 238 N.C. 264, 77 S.E.2d 652, 654 (1953); *Rodriguez v. W.O.W.*

*Life Ins. Soc.,* 136 Tex. 43, 145 S.W.2d 1077, 1079 (1941); *Van Riper v. Constitutional Gov't League,* 1 Wash.2d 635, 96 P.2d 588, 590 (1939). This rule, however, does not apply in this case. First, the record does not reflect, nor does Sentry claim, that "manifest" has acquired a clear, definite, and recognized technical meaning in the field of pollution insurance, or a meaning so pervasive and well-settled that the technical meaning may be presumed to have been known to the parties. *Cf. Westmoreland–LG&E Partners v. Virginia Elec. & Power Co.,* 254 Va. 1, 9, 486 S.E.2d 289 (1997). Second, the term "manifest" has not been subject to widespread or uniform judicial construction; instead, it is the term "occurrence" that courts have construed to mean "discovery" in some cases, and "manifestation theory" has been the judicially created term used to describe this group of cases. Thus, it cannot fairly be said that "manifest" has been subject to careful, consistent, and widespread construction by the courts. Finally, where language is susceptible to two reasonable constructions, the one in favor of the insured and of coverage should be adopted. *See Fidelity & Cas. Co. of N.Y. v. Fratarcangelo,* 201 Va. 672, 112 S.E.2d 892, 895 (1960) ("'[W]here the language of the policy is susceptible of two constructions, as manifested in argument, it is to be construed strictly against the insurer and liberally in favor of the insured."') Thus, the definition of "manifest" that should be adopted—even if discovery is a possible interpretation of the term—favors coverage in this case.

construed *contra preferentem*, or against the drafter. *See U.S. Fidelity & Guar. Co. v. McGlothlin*, 240 Va. 21, 392 S.E.2d 814, 815–16 (1990). Thus, as the Supreme Court of Virginia has stated, "[b]ecause the principal purpose of insurance is protection and insurance policies are drafted by insurance companies, if the language of the policy is capable of different interpretations, we will construe it in favor of coverage or indemnity and against a limitation of coverage." *United Servs. Auto. Ass'n v. Webb*, 235 Va. 655, 369 S.E.2d 196, 198 (1988); *see, e.g., Mollenauer v. Nationwide Mut. Ins. Co.*, 214 Va. 131, 198 S.E.2d 591, 592 (1973); *National Fire Ins. Co. v. Dervishian*, 206 Va. 563, 145 S.E.2d 184, 187 (1965). In particular, though an insurer may limit its liability in the insurance contract, where exclusions from or limitations to the coverage provided by an insurer are not drafted plainly and unambiguously, they will be construed against the insurer and in favor of coverage so as not to defeat the purpose of insurance. *See Lower Chesapeake Assocs. v. Valley Forge Co.*, 2000 WL 741529, at *6–*7 (Va. June 9, 2000).

These guides to construction of the Sentry policy language compel the conclusion that, even if "manifest" is deemed ambiguous as possibly meaning both discover*able* and discover*ed*, the Sentry policies must nevertheless be construed to provide coverage when property damage becomes discover*able*. Adopting Sentry's definition of "manifest" would not only be contrary to the plain meaning of the term "manifested," but would also run counter to these principles of construction in favor of the insured and of coverage in the face of Sentry's failure unambiguously and clearly to define "manifest."[23] *See Town Crier*, 721 F.Supp. at 101. If Sentry intended to limit coverage under the pollution liability insurance to property damage that was *discovered* during the year the policy was in effect, Sentry had at its disposal an arsenal of more accurate terms, chief amongst which, of course, is "discovery" itself. "Where an insurer drafts policy language setting forth exclusions that limit coverage under a policy, the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions." *Lower Chesapeake*, 2000 WL 741529, at *6. Sentry has

---

**23.** Interpreting "manifest" to mean discoverable, moreover, is consistent with nature of an occurrence-based policy and with the expectations of the insured, as an occurrence of bodily injury or property damage—here, when the property became polluted, with each discharge of PCE, to a legally significant level—has nothing to do with when that injury or damage is discovered. *Cf. Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 627 (2d Cir.1993) (holding that "actual injury to property—the presence of the asbestos hazard—occurs upon installation and exists regardless of whether it yet has been discovered by the building owners"). As the Sixth Circuit has observed, "[I]t is the injury and not its discovery that makes [the insured] liable in the underlying ... suit," and "[l]inguistic uniformity should not dictate how contracts or statutes are interpreted," for, at bottom, "[i]nsurance contracts are meant to cover the insured." *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1220 (6th Cir.1980).

The Sentry policies in question cover precisely that—injury or property damage occur-

ring during the policy periods—and "the law makes every rational intendment to the end that the purpose of insurance, which is that of indemnity, should be effectuated." *Dressler v. Insurance Co.*, 200 Va. 689, 107 S.E.2d 406, 408 (1959). To adopt Sentry's position would produce the inequitable result of retrospectively turning these occurrence-based policies to less expensive claims-made ones, though the insureds doubtless reasonably expected coverage to apply to the situation here at issue. *See, e.g., Harford County v. Harford Mut. Ins. Co.*, 327 Md. 418, 610 A.2d 286, 294–95 (Md.Ct.App.1992) (finding that adoption of the manifestation/discovery theory would be tantamount to giving the insurance company the ability to turn an occurrence-based policy into a claims-made one); *Marathon Flint Oil Co. v. American States Ins. Co.*, 810 F.Supp. 850, 853 (E.D.Mich.1992) ("The Court is convinced ... that the Michigan Supreme Court will reject the manifestation theory because it provides the same protection for the insurance company as a claims made policy without the reduction in premiums for the insured.").

failed to do so in this case, at least with regard to its claim that "manifest" means discovery. It is true that insurers would benefit if the manifestation theory applied because, as is true with claims-made policies, restricting coverage to injuries or damage actually discovered during the policy period would afford them maximum certainty as to their potential indemnity liability.[24] With hindsight, insurers may have been well advised to have issued claims-made policies instead of occurrence-based policies vis-à-vis pollution coverage.[25] But this would not be faithful to the expectations of insureds in this case at the time they bought the Sentry policies.

From the insurer's standpoint, in retrospect, property damage resulting from gradual or latent contamination would have been better suited to a claims-made policy. This does not change the fact, however, that the policies at issue are "occurrence" policies and does not provide any basis to deny coverage by application of a judicially created manifestation theory.

*Gelman Sciences,* 1998 WL 795216; *see Marathon Flint Oil Co. v. American States Ins. Co.,* 810 F.Supp. 850, 853 (E.D.Mich.1992).

■ These considerations compel the conclusion that, in interpreting these insurance contracts, the insureds must receive the benefit of the doubt if there is any uncertainly over the extent of coverage or, conversely, the reach of any exclusions. Accordingly, the Sentry policies—and Sentry's duty to defend—were implicated in the underlying suit if the underlying Greenbriar complaint alleged facts and circumstances that, if proved, would show that property damage was discoverable during the policy periods.[26]

---

24. *See, e.g., Pacific Employers Ins. Co. v. Superior Court,* 221 Cal.App.3d 1348, 270 Cal. Rptr. 779, 784 (1990) (noting that emergence of claims-made malpractice insurance policies resulted from "an effort to reduce [insurers'] exposure to an unpredictable and lengthy 'tail' of lawsuits filed years after the occurrence they agreed to protect against").

25. Indeed, the Fourth Circuit, in adopting discovery as the appropriate trigger in *Mraz,* recognized—and appears to have been primarily moved by—the difficulty that insurers face with occurrence policies in environmental damage cases:

> The general rule is that '[t]he time of the occurrence of an accident is not the time the wrongful act was committed but the time when the complaining party was actually damaged.'
>
> There are situations, however, in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes in this case is a clear example. Determining exactly when damage begins can be difficult, if not impossible.

*Mraz,* 804 F.2d at 1328 (citations omitted). This concern, however, does not compel the conclusion that "manifest" as used in the Sentry policies be construed accordingly, for "a theory adopted for its convenience, which goes directly against the plain policy language, must be rejected." *Gelman Sciences,* 1998 WL 795216.

26. Sentry argues, however, that "manifest" must mean "discovered" because courts that apply a "manifestation trigger" to occurrence-based environmental insurance use the term "manifest" to refer to the actual discovery of damage. Sentry specifically refers to the Fourth Circuit's decision in *Mraz* for the proposition that "manifestation and discovery are identical." This argument, however, also must fail.

*Mraz* is inapplicable in this case. First, the Fourth Circuit in that case was applying Maryland law, not Virginia law. Moreover, *Mraz* has not been followed by Maryland courts. *See Harford Co. v. Harford Mut. Ins. Co.,* 327 Md. 418, 610 A.2d 286, 294–95 (1992) (rejecting the Fourth Circuit's approach in *Mraz*). Second, the manifestation theory—indeed, the determination of the appropriate trigger as a whole—is inapplicable to this case because the Sentry policies themselves define an "occurrence" that triggers coverage. Specifically, the four theories outlined above and the cases defining and applying them involve the definition of "occurrence" in liability policies that generally do not further define the term, *see supra* notes 7–11 and accompanying text; here, on the other hand, the policy itself defines "occurrence" as "the date on which bodily injury or property damage first manifests itself." Third, as discussed above, the meaning of "manifest" as an interpretive matter is plain. *See supra* notes 17–21 and accompanying text.

Moreover, insofar as *Mraz* and other courts have used the term "manifestation" to de-

The underlying complaint in the Greenbriar case alleged that PCE was released throughout the time plaintiffs operated their dry-cleaning business, beginning in 1986. Thus, while the record does not reflect when the PCE contamination reached a detectable level (an issue that can be addressed at trial), a reasonable inference to be drawn from the allegations of the complaint is that the property was damaged by PCE discharges that occurred throughout the period. A further reasonable inference is that if these discharges caused damage, they were detectable in the soil and groundwater—and the damage, therefore, manifested itself—years before the contamination was discovered by Greenbriar in 1996. PCE contamination was not discovered by Greenbriar until 1996 because it had looked or tested for PCE until 1996, when the Greenbriar Town Center was sold, *not* because the contamination was not in the soil to be discovered. In other words, while the property damage caused by the PCE contamination was not *discovered* by Greenbriar until 1996, it may have *manifested itself* years earlier, at the point at which the PCE contamination from each iterative discharge was *detectable and discoverable* in the soil and groundwater by virtue of reasonable testing.

The underlying complaint does not say when the PCE damage first became detectable; rather, it simply states that an environmental assessment conducted "in 1996 was the first time Greenbriar LP learned of the PCE contamination at and emanating from the [plaintiffs'] Facility." Significantly, the complaint also contained allegations that in 1989 a Fairfax County Health inspector inspected plaintiffs' store site and determined that at least ten releases of PCE had occurred. Based on this, the complaint alleged that plaintiffs were aware of the PCE contamination and the resulting property damage as early as 1989.

The complaint, therefore, leaves open the possibility that the PCE contamination "first manifest[ed] itself" during the period the pollution liability insurance was in effect, namely 1991 though 1995. Accordingly, Sentry had a duty to defend plaintiffs against the underlying lawsuit. *See Town Crier*, 721 F.Supp. at 103 (holding that there is a duty to defend if any of the complaint's allegations fall within the risk covered by the policy). When the property damage from the discharges actually first manifested itself—that is, when it became reasonably detectable in the soil—is a question of fact, which will have to be resolved at the duty-to-indemnify stage. But, for the purposes of Sentry's motion

---

scribe an approach to determining when an event constitutes an "occurrence" that looks to the discovery of injury or damage, these courts have not focused on whether the label they have used for this judicially crafted approach—namely, "manifestation theory"—accurately describes what they have been trying to do—specifically, equate "occurrence" with "discovery." Yet, the use of the term "manifest" to describe this approach is not entirely faithful to the plain meaning of the term, for, as discussed above, while a phenomenon that has been discovered may always be manifest, one that is manifest does not have to be discovered. It appears, therefore, that "manifestation theory" is somewhat of a misnomer and is, therefore, of little help to Sentry in this case. And to the extent that courts in invoking manifestation theory have not devoted any analysis to the actual meaning of "manifest," focusing instead on the meaning of "occurrence," these cases cannot be regarded as

interpreting "manifest," as a matter of law, to mean "discovered." In this regard, the admonition that " 'trigger rulings are most appropriately derived by reference to the operative policy language, as opposed to the judicial gloss placed upon similar language in ostensibly analogous cases,' " because "some courts are too hasty in applying a particular trigger without considering the relevant policy language" is particularly pertinent here. *Gelman Sciences*, 1998 WL 795216 (quoting *Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F.Supp. 474, 479 (E.D.Mich. 1989)). Accordingly, the manifestation theory in general and *Mraz* in particular are not persuasive in this case, particularly in light of the plain and ordinary meaning of "manifest" as elucidated above. And *Mraz*, at most, stands only for the proposition that, as a matter of Maryland law (as temporarily divined by a federal court), *occurrence* meant discovery.

and of the duty to defend, the inquiry is limited to whether any of the underlying complaint's allegations fall within the risk covered by the policy. They do. *See id.*

For the foregoing reasons, Sentry's motion to alter or amend the judgment in *Morrow I* pursuant to Rules 52(b) and 59(e), Fed.R.Civ.P. is **DENIED.**